# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **STEVEN D. KISH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **10-CV-225-WDS** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**STIEHL, District Judge:**

Before the Court is a Report and Recommendation of United States Magistrate Judge Clifford J. Proud (Doc. 32), recommending that this Court find that the ALJ's decision is supported by substantial evidence in the record as a whole and that no errors of law were made and affirm the final decision of the Commissioner that Claimant is not disabled. Claimant Steven D. Kish has timely filed objections to the Report and Recommendation (Doc. 33). Defendant Commissioner of Social Security has not responded. Upon review of the record, the Court **REJECTS** the Report and Recommendation of Magistrate Judge Clifford J. Proud (Doc. 32), and **REMANDS** this matter to the ALJ for further findings. Pursuant to 28 U.S.C. § 636(b), the Court has made a de novo review of those portions of the Report and Recommendation to which objections were filed. The Court notes that the record in this case is quite extensive, at nearly 900 pages.

## BACKGROUND

### A. PROCEDURAL HISTORY

Claimant applied for disability benefits on January 25, 2007, alleging disability

beginning on May 19, 2006. The Social Security Administration denied his application on April 2, 2007. Claimant requested a hearing before an administrative law judge ("ALJ"), and a hearing was held before ALJ Victor L. Horton, who also denied Claimant's application. Claimant's subsequent request for review by the Appeals Council was denied. Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. Claimant now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## B. HEARING TESTIMONY – FEBRUARY 24, 2009

### 1. Claimant's Testimony

At the time of the hearing, Claimant was 38 years old. (Tr. 28). He was legally married but is separated from his wife. (Tr. 28, 55). He was contemplating a divorce, but had not gone forward with it because of monetary issues. (Tr. 56). He was 68 inches tall and weighed 250 pounds. (Tr. 30). He is right-handed, lived in a duplex owned by his parents. (Tr. 28, 30). Claimant attended three years of college but did not obtain a degree. (Tr. 29). He has dyslexia and went through college with some assistance. (Tr. 30). He did not finish college because of depression, stress, and family issues. (Tr. 55). He has no certifications in the nursing field but was formerly certified as a paramedic. *Id.* At the time of the hearing, Claimant received $115.00 a month from his parents and had no other income. (Tr. 31). He did not receive food stamps or Medicaid, and had no insurance, but had a worker's compensation claim pending. *Id.*

Claimant last worked on May 15, 2006. *Id.* He was discharged for chronic tardiness and failure to report a non-duty injury. (Tr. 33). He had a difficult time getting started in the morning due to back pain, as he moved slowly. *Id.* He worked for the American Red Cross as a phlebotomist for fifteen months. (Tr. 34). He worked as a paramedic from 2000 through 2004.

(Tr. 34). He was discharged from duty following a back injury. (Tr. 35). Prior to working as a paramedic, Claimant worked as an EMT from 1997 through 2000. (Tr. 36). He left the job to transfer to the main company in St. Louis and to use his paramedic skills. (Tr. 36). He held a position as a part-time EMT before 1997. (Tr. 37). He worked as a nurses' aid for one summer when in college. *Id.* He worked in a Disney store, part-time, as a sales associate for three to four months. (Tr. 38). He worked part-time as a bartender for two to three months while in college. *Id.*

Due to his back injury, Claimant had a discectomy to correct injured discs and a pinched nerve, but he still suffers frequent muscle spasms. (Tr. 38-39). He has frequent muscle spasms with activity; which affect his ability to do household chores. (Tr. 38). He is unable to lift. Id. He has a TENS unit that he uses on his lower back. (Tr. 39). He had three steroid injections in 2006 that provided some relief, but the pain returned immediately. (Tr. 40). Claimant has some difficulty sleeping and uses a CPAP. *Id.* He broke both lower leg bones and dislocated his right ankle on February 23, 1999 when he fell from a ladder at a fire academy. (Tr. 41, 58). He had six surgeries, including two fusion operations. (Tr. 59). He did three years of rehab and was reclassified to a desk job during that time. *Id.* Claimant wore a brace, orthotics, a heel lift, and compression stockings. (Tr. 42). He experienced a great deal of pain and swelling. *Id.* It was necessary for him to elevate his leg and ice it, which was very painful. *Id.* He still received treatment as needed from a bone and joint doctor. (Tr. 59). He has a limp that is more pronounced with changes in weather. (Tr. 58). When he was discharged to return to work, he was told he could infrequently lift fifteen to twenty pounds. (Tr. 43).

Claimant has had depression and anxiety problems since he was about eighteen years old,

and has taken antidepressants on and off. (Tr. 45). *Id.* After his back injury, he saw Mr. Tobin, who treated him for stress, anxiety, and depression. (Tr. 64-65.) He took Cymbalta for depression and had, at one time contemplated suicide. (Tr. 65, 72). He called Dr. Irvin, who informed him to go directly to St. John's Mercy. (Tr. 72). He had recurring nightmares due to post-traumatic stress disorder from falling off the ladder. (Tr. 73). At the time of the hearing, he was under treatment by Dr. Conner for depression and post-traumatic stress disorder. (Tr. 73). He was also being treated by Dr. Irvin and Tobin for depression, anxiety, and post-traumatic stress disorder. (Tr. 73-74). He was not taking any pain medication at the time of the hearing. *Id.* He wore a back brace. (Tr. 47). He took over-the-counter sleep aid. (Tr. 48). Claimant was easily irritated and frustrated. (Tr. 49). He took Clonazepam for anxiety. He does not smoke, use alcohol, or use illegal drugs. (Tr. 49).

Claimant drives and owns his own vehicle. (Tr. 50). He lived in half of a duplex owned by his parents. *Id.* His parents lived next door. *Id.* He did not cook. *Id.* He did wash dishes, do laundry, and clean his duplex, but had to take frequent breaks. (Tr. 50, 54). Claimant tried to help with outside work. (Tr. 51). He mowed the yard with a riding mower, but is limited to twenty minute durations. *Id.* He did no trimming, leaf blowing, or raking. *Id.* Claimant goes grocery shopping with his mother and brother, but it is difficult for him. *Id.* He likes to play board games and darts. (Tr. 54). In a normal eight-hour day, Claimant spent six hours sitting, one hour walking, and forty-five minutes standing. *Id.* Claimant lies down almost every day. (Tr. 55). If Claimant must do a household chore, he is up about fifteen minutes, then afterward, lies down about ninety minutes. *Id.* He spends most of a twenty-four hour period sleeping or reclining in his recliner. (Tr. 74).

4

### 2. Ms. Joanne Kish – Claimant's Mother

Ms. Kish testified that she lived in one side of a duplex and the Claimant lived on the other side. (Tr. 76). She said that when Claimant was younger he showed signs of depression. (tr. 76). It became so bad that he was hospitalized. (Tr. 76). He then was seen as an outpatient. (Tr. 77). He went daily to a program and Dr. Conner was his doctor. *Id.* She talked Claimant into moving in with her because she was worried about his anxiety, sleep troubles, temperament, and that he might harm himself. *Id.* She testified that Claimant slept and complained a lot. (Tr. 78). She said he thinks he is to blame if there is an issue. *Id.* She said Claimant has difficulty walking around the store while grocery shopping and must rest every twenty minutes. *Id.* She believed Claimant would have difficulty working because of his back, foot, and concentration issues. (Tr. 79). She testified Claimant could stand for about twenty minutes before he has to sit down. (Tr. 80). She said Claimant becomes irritated by sitting for longer than twenty minutes straight. (Tr. 81). She stated that Claimant sleeps about fifteen hours a day and that he does not have much energy. *Id.* She testified that Claimant's memory has worsened since his injury and that he is repetitive. (Tr. 81-2). She said Claimant does not have concentration. (Tr. 82). She stated Claimant does not interact with many people and his peer group has diminished. *Id.* She testified that she assists Claimant in buying medication and provides gas money for him to see his therapist. (Tr. 83).

### 3. Dr. Jeffrey McGrowski – Vocational Expert ("VE")

Dr. Jeffrey McGrowski, a VE, testified at the hearing regarding existing jobs in the economy which might be suitable for Claimant. (Tr. 88-93). In response to the ALJ's

hypothetical question about an individual with Claimant's education, training, work experience, and the following limitations: lift and carry 20 pounds occasionally and ten pounds frequently; understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple, work-related decisions; adapt to routine simple work changes; should not work in a setting which includes constant regular contact with the general public; and should avoid concentrated exposure to extreme cold, wetness, and humidity. (Tr. 89). The VE then opined that Claimant could perform the following light and unskilled jobs: office helper (4,000 jobs in Illinois), simple assembly (2,000 jobs in Illinois), and packer (2,000 jobs in Illinois). (Tr. 90). The VE then said that if the above hypothetical individual required three absences per week because of fatigue and his mental condition, the individual would be unable to perform any job. (Tr. 91). The VE further testified that if the hypothetical individual had to avoid repetitive bending, twisting, stooping, and had a difficult time keeping his gait so that the he could not do the jobs identified above. *Id.*

### C. MEDICAL EVIDENCE – PHYSICAL HEALTH

#### 1. Prior to Alleged Onset of Disability

Between June 1998 and September 2001 Claimant was treated on numerous occasions by physicians at St. Elizabeth's Hospital. (Tr. 240-363). In July 1998, he was treated for right flank and abdominal pain. *Id.* On February 6, 1999, Claimant was treated for a back injury and underwent surgery for a fractured ankle. *Id.* From June through September 1999, and again from February through April 2000, Claimant underwent physical therapy for a fractured ankle. (Tr. 255-73 and 480-92). In November 2000, he underwent treatment for cysts. (Tr. 469). In August

and September 2001, January 2002, and June 2003, Claimant received treatment for obstructive sleep apnea. (Tr. 347, 418-19, 424-25, 430-31).

On January 29, 2003, Claimant sought treatment for pain and swelling of his ankle from Dr. Richard B. Helfrey, who referred him for pain management and renewed his prescriptions. (Tr. 504). In June 2003, Dr. Helfrey prescribed Claimant an ankle brace. (Tr. 503). In August 2004, Dr. Helfrey performed an injection of the ankle. *Id.* In September 2004, Claimant sought treatment for right ankle pain. (Tr. 502). Dr. Helfrey prescribed continued use of a brace. *Id.*

On September 24, 2004, Claimant reported a back injury resulting from lifting a patient while working as an EMT (Tr. 539-45). On October 13, 2004, an MRI revealed bulges and protrusions at three levels of the spine. (Tr. 522). From October through December 2004, Claimant underwent treatment from Dr. James. T. Doll, who diagnosed him with persistent low back pain, right groin and thigh pain, and lumbar spondylosis. (Tr. 538-38). On January 24, 2005, Claimant received treatment from Dr. Naseem Shekhani for his lower back injury. (Tr. 524-35). Dr. Shekhani prescribed physical therapy and work restrictions related to lifting, pulling or pushing more than fifteen pounds. *Id.* When Dr. Shekhani examined Claimant on March 3, 2005, Claimant reported having pain that increased with activity and relieved with rest. (Tr. 532-33). Dr. Shekhani noted that back range of motion was within normal limits. *Id.* On March 17, 2005, Claimant stated that he was doing much better and reported he was ready to return to work. (Tr. 533-4). Dr. Shekhani stated Claimant had reached maximum medical improvement and could return to work with no restrictions. *Id.* On October 3, 2005, Claimant was again treated by Dr. Doll for his low back injury. (Tr. 537-38). Dr. Doll noted several disc protrusions and opined that Claimant had a degenerative lumbar spine condition. *Id.* Claimant was also

treated by Dr. Darren E. Wethers on four occasions from August 2005 through November 2005. (Tr. 780-87).

On April 11, 2006, Dr. Robert P. Margolis evaluated Claimant. (Tr. 639-44). Dr. Margolis opined that Claimant had "partial disability of 35 percent of his person as a whole." *Id.* It was also Dr. Margolis's opinion that Claimant's other disabilities combine to create a greater disability than the 35% figure, and that his conditions are hindrances and obstacles to obtaining and maintaining employment. *Id.* Furthermore, Dr. Margolis stated that Claimant should avoid repetitive bending, twisting, and stooping. *Id.*

### 2. After Alleged Onset of Disability

On May 18, 2006, a magnetic resonance imaging (MRI) scan showed "evidence of degenerative disc disease at multiple levels" and a "broad based lateral disc herniation at the L3-L4 level on the right with impingement upon the exiting right L3 nerve root." (Tr. 627). Also on May 18, 2006, Dr. William D. Sprich examined Claimant. (Tr. 633-34). He noted that Claimant had a far lateral disc herniation at L3-L4 to the right-hand side causing L3 radiculopathy and that it was more prominent in 2006 than when compared to the 2004 study. *Id.* He recommended keeping Claimant off work and referred Claimant to Dr. Gahn for epidural blocks. *Id.* Claimant was examined by Dr. Richard S. Gahn, a pain management specialist, on June 5, 2006. (Tr. 624-26). Dr. Gahn noted recent MRI scan findings of degenerative disc changes from L3-L4 through L5-S1. *Id.* Dr. Gahn provided Claimant with a fluoroscopically guided lumbar epidural steroid injection at the L3-L4 interspace. *Id.* Dr. Gahn also performed injections on June 19, 2006 and July 12, 2006. *Id.* Dr. James J. Coyle, a spinal surgeon, performed an independent medical evaluation on September 15, 2006. (Tr. 651-52). Dr. Coyle recommended surgery due to

Claimant's herniated disc due to his work-related injury on September 24, 2004. *Id.* Claimant

was admitted to Des Peres Hospital on October 17, 2006. (Tr. 655-65). He underwent an L2-L3,

L3-L4, and L4-L5 wide decompressive laminectomy with a posterior intertransverse fusion with

local bone graft. *Id.* Claimant was discharged on October 20, 2006. *Id.*

Records from Rehab 1 Network reveal that Claimant was referred for physical therapy by

Dr. Michael Chabot. (Tr. 807). Claimant underwent physical therapy on approximately 65

occasions from October 2006 through March 2007. (Tr. 823-54). In February 2007, Claimant

reported continued soreness, but he could perform household chores with fatigue by the end of

the day. *Id.* On February 26, 2007, Dr. Chabot noted that Claimant had been on a work-

conditioning program and was advancing reasonably well. (Tr. 860). Dr. Chabot recommended

that Claimant continue work-conditioning treatment, but he could return to limited work duty

with no lifting of more than 50 pounds and no frequent lifting of more than 10 to 15 pounds. *Id.*

On March 29, 2007, D. Babcock, a state agency disability examiner opined that Claimant could

perform a range of light work, including the ability to lift 20 pounds occasionally and 10 pounds

frequently; sit and stand/walk for a total of 6 hours each in an 8-hour workday. (Tr. 910).

### D.  MEDICAL EVIDENCE – MENTAL HEALTH

#### 1.  Prior to Alleged Onset of Disability

Claimant has had a history of depression since high school in 1989.  The evidence shows

that from May 2000 through December 2000, Claimant was treated by Dr. David M. Conner

approximately 22 times due to depression. (Tr. 546-51). On approximately 26 occasions from

January 2001 through December 2001, Claimant followed up with Dr. Conner for more mental

health treatment. *Id.* In August 2001, Dr. Conner diagnosed Claimant with severe major

depression, recurrent in type. (Tr. 557). Dr. Conner indicated that Claimant was "no longer able to work due to the severity of his emotional disorder," and he recommended partial hospitalization. *Id.* From September 4 through September 21,2001, Claimant underwent treatment at St. Elizabeth's Hospital due to major depression, including treatment in the intensive outpatient program. (Tr. 341, 436). On September 10, 2001, Byron Loy, LCPC, gave Claimant a Global Assessment of Functioning ("GAF") and assessed him at a level of 49. (Tr. 449). On September 21, 2001, Loy diagnosed recurrent major depression and assessed Claimant a GAF of 65. (Tr. 436). Claimant continued treatment with Dr. Conner on approximately 65 occasions between January 2002 and October 2005 for mental health issues. (Tr. 609-22). During that time, Claimant primarily felt stress from his marriage and work. *Id.* In October 2003, Dr. Conner recommended partial hospitalization in response to Claimant's plan to commit suicide due to work pressure. (Tr. 571-4). Claimant underwent partial hospitalization in November 2003. (Tr. 571). In August 2004, Claimant underwent psychotherapy at Christian Hospital. (Tr. 580). In December 2004, Dr. Conner was concerned about the stress from Claimant's job termination and stated that he hoped it would not "cause his nerves to become so bad that he becomes disabled." (Tr. 584). In July 2005, Dr. Conner stated that Claimant was going to start individual psychotherapy. (Tr. 588).

### 2. After Alleged Onset of Disability

On May 31, 2006, Claimant began seeing a new psychiatrist, Dr. William Irvin, Jr. (Tr. 797-8). Claimant saw Dr. Irvin for mental health treatment approximately once a month through February 2007. (Tr. 789-98). Dr. Irvin continued to diagnose Claimant with major recurrent depressive disorder and prescribed psychiatric medications. *Id.* On December 18, 2006, Claimant

visited St. John's Mercy Hospital due to increasing depression, irritability, anger, pain and loss of hope, including thoughts of suicide. (Tr. 758-60). Dr. Irvin diagnosed plaintiff as suffering from major depression. *Id*. In June 2007 and September 2007, Claimant underwent mental health treatment, including psychotherapy with Dr. Conner. (Tr. 622). On September 5, 2007, Dr. Irvin completed a Medical Source Statement. (Tr. 403-6). Dr. Irvin indicated that Claimant could not perform light or sedentary work, even with the ability to alternate sitting and standing, and that such limitations existed since September 2004. *Id.* He noted severe limitation with maintaining concentration, working within a schedule and completing a normal workday without interruption from symptoms. (Tr. 405). On approximately 26 occasions from September 2006 through June 2008, Claimant underwent counseling for mental health issues with Mark Tobin, LPC, CCMHC. (Tr. 1044-1116).

On March 27, 2007, Dr. James Lane reviewed the medical evidence and Claimant's reported activities for the state agency and completed a Psychiatric Review Technique form. (Tr. 898-908). He opined that Claimant had an affective disorder (major recurrent depression) and an anxiety-related disorder (generalized anxiety disorder). *Id.* Dr. Lane stated that Claimant had the following limitations: mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; no difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. 906). On March 30, 2007, Dr. Lane completed a Mental Residual Capacity Assessment form and noted that Claimant had moderate work-related limitations in the following areas: work in coordination with or proximity to others; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (Tr. 915-16). Dr. Lane concluded that

Claimant could interact adequately with peers and supervisors but should avoid work involving significant public contact or teamwork. (Tr. 917).

On June 29, 2007, Tobin completed a Medical Source Statement indicating that Claimant had major depression, with severe limitations concentrating, performing activities within a schedule, maintaining regular attendance, and completing a normal workday and workweek without interruptions from medical based symptoms. (Tr. 1025). On October 9, 2007, Tobin completed a Narrative Source Statement. (Tr. 1027-9). He noted numerous symptoms, including depressed affect, low self-image, lack of energy, sleeplessness, excessive anxiety, chronic emotional disturbance, and recurrent and persistent depression that interferes with Claimant's job performance. (Tr. 1028). Tobin assessed Claimant a GAF of 40 and diagnosed "major depression disorder, recurrent, severe," and "generalized anxiety disorder, severe." (Tr. 1029). He further stated that he consulted with Dr. Irvin and his opinion was that the effect of the Claimant's cumulative injury led to his "permanent and total mental disability." (Tr. 1027).

On February 15, 2008, Tobin provided a detailed summary of certain mental health treatment records dating back to May 2000. (Tr. 1031-40). He explained how Claimant's medical history supported a conclusion that he was disabled. *Id.* On October 13, 2008, Dr. Wayne A. Stillings performed a psychiatric Independent Medical Examination, diagnosing Claimant with a chronic and severe major depressive disorder; a post-traumatic stress disorder, chronic, in partial remission; a partner-relational problem; and a personality disorder, with depressive, dependent, avoidant, and passive-aggressive personality traits. (Tr. 1126-1137). Dr. Stillings assigned Claimant a GAF of 70 to 72, consistent with mild to no significant psychiatric problems. (Tr. 1137). He stated that Claimant was functioning pretty well from a psychiatric

standpoint, and he could work without restrictions, limitations, or accommodations. (Tr. 1138).

On January 21, 2009, Tobin noted continued mental health issues and assessed a GAF of 53. (Tr. 1139-42). He again diagnosed recurrent severe major depression and acute anxieties. (Tr. 1139). On February 10, 2009, Tobin responded to Dr. Stillings's Independent Medical Examination, (Tr. 1143-6), and described certain inconsistencies with Dr. Stillings's assessment. *Id.* In particular, Tobin opined that Dr. Stillings contradicts himself and that Dr. Stillings's GAF assessment of 70 was inconsistent with his own objective findings. *Id.*

### E. Function Report – March 3, 2006 (Physical and Mental)

Claimant stated that he could do the following: attend physical therapy; shop for groceries, but it causes back spasms; pick up prescriptions; prepare simple meals; do dishes; watch television; cook, light cleaning, and run errands for a disabled friend; care for two cats, but with assistance; dress; bathe; care for his hair; shave; feed himself; push a lightweight sweeper; make his bed; dust; drive a car; go out alone; shop in stores; pay bills; handle a savings account; count change; use a checkbook; use the computer for internet activities; read; play games; work on his car; get along with others; sit; walk; follow written instructions; follow spoken instructions; and maintain attention. (Tr. 150-57). Claimant stated that he had some problems with the following: lifting; squatting; bending; standing; reaching; kneeling; stair climbing; completing tasks; and sleeping. *Id.*

### DISCUSSION

### A. SOCIAL SECURITY GUIDELINES

To qualify for disability benefits or supplemental security income, a claimant must be "disabled." *Barnhart v. Thomas,* 540 U.S. 20, 21 (2003). "Disabled" is defined as the "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

A person qualifies as disabled, and thereby eligible for benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ..." 42 U.S.C. § 423(d)(2)(A). " '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

The Social Security regulations provide a five-step sequential inquiry for determining whether a plaintiff is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*

If the Commissioner finds that the claimant is disabled or not disabled at any step, the evaluation process stops. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or five, then there is a finding of disability. *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir.2005). At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. § 404.1520(a)(4)(iii). However, if the impairment is not listed, the Commissioner assesses the claimant's RFC, which is used to determine whether the claimant can perform past work under step four or any other work in society under step five. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor,* 425 F.3d at 352.

### B. STANDARD OF REVIEW

Under the Social Security Act, a court must sustain the Commissioner's findings if the findings are supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is "more than a mere scintilla" of proof. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir.1999). The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401. Although judicial review of the decisions of administrative agencies is deferential, it is not abject. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), as amended on reh'g in part (May 12, 2010).

A court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Id.* An ALJ's decision "cannot stand if it lacks

evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v.*

*Barnhart,* 336 F.3d 535, 539 (7th Cir.2003) (citing *Steele v. Barnhart,* 290 F.3d 936, 940 (7th

Cir.2002)); *Carradine v. Barnhart,* 360 F.3d 751, 756 (7th Cir.2004). The Court is to consider

the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute [its] own judgment for that of the Commissioner." *Lopez ex. rel.*

*Lopez,* 336 F.3d at 539 (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000)).

## ANALYSIS

Claimant raises multiple issues in his objection to the Report and Recommendation: (1)

whether the ALJ erred in determining his RFC with respect to his physical conditions; (2)

whether the ALJ erred in determining his RFC with respect to his mental conditions; (3) whether

the ALJ failed to accord sufficient weight to treating physicians under 20 C.F.R. § 404.1527(d);

(4) whether the ALJ gave sufficient weight to the lay witness testimony of his mother, Joanne

Kish; (5) whether the ALJ properly analyzed his credibility; (6) whether the ALJ improperly

relied on testimony from a vocational expert that was inconsistent with the Dictionary of

Occupational Titles or unsupported by the evidence; and (7) whether the ALJ  adequately

reviewed or considered numerous treatment records prior to the onset date of disability, May 19,

2006. Claimant asks the Court to reject the Report and Recommendation and remand this matter

to the Commissioner for a new hearing. Because the Court finds that the ALJ's opinion fails to

demonstrate an assessment of all the medical evidence regarding Claimant's mental health

treatment, the Court need not address the other objections.

### A.THE ALJ'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

RFC is an administrative assessment of what work-related activities an individual can

perform notwithstanding his limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th

Cir.2001); SSR 96-8p. When determining the claimant's RFC, the ALJ must consider both the

medical and non-medical evidence in the record. *Dixon*, 270 F.3d at 1178.

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts ... and
> nonmedical evidence ... In assessing RFC, the [ALJ] must discuss the
> individual's ability to perform sustained work activities in an ordinary work
> setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week,
> or an equivalent work schedule) ... The adjudicator must also explain how any
> material inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved … The RFC assessment must include a discussion of
> why reported symptom-related functional limitations and restrictions can or
> cannot reasonably be accepted as consistent with the medical and other
> evidence. The RFC assessment must always consider and address medical
> source opinions. If the RFC assessment conflicts with an opinion from a
> medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p.  Although an ALJ need not discuss *every* piece of evidence in a claimant's record,

the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v.*

*Barnhart,* 322 F.3d 912, 917 (7th Cir.2003); *Henderson v. Apfel*, 179 F.3d 507, 514 (7th

Cir.1999); *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir.1995). This is necessary so that a reviewing

court can tell whether the ALJ's decision rests upon *substantial* evidence. *Diaz,* 55 F.3d at

307. Therefore, the ALJ must articulate, at some minimal level, his analysis of the evidence to

permit an informed review. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Rice v.*

*Barnhart,* 384 F.3d 363, 371 (7th Cir.2004).

### 1.  Dr. David M. Conner

Claimant contends that the ALJ failed to analyze the records and opinions of Dr. Conner,

who treated Claimant on approximately 109 occasions from May 2000 through September 2007.

Because the majority of the medical records from Dr. Conner pre-date Claimant's alleged onset

on disability, Claimant further contends that the ALJ failed to adequately review or consider numerous treatment records dating back to 2000.

Claimant asserts that he was treated by Dr. Conner on approximately 109 occasions due to depression from May 2000 through September 2007.[1] Though Claimant was treated by Dr. Conner, by the Court's count on review of the record, on at least 120 occasions, the ALJ's decision does not refer at all to Dr. Conner, nor does it discuss any treatments prior to January 24, 2005.

With respect to the latter, it does not appear the Seventh Circuit has directly addressed an AL's consideration of medical evidence in the record which predates the claimant's alleged onset of disability. However, the Regulations state that *all* evidence submitted by a claimant in support of alleged disability will be considered. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). Further, although it is not binding on this Court, the Tenth Circuit has developed precedent that ALJs are required to examine the *entire* record including medical evidence prior to the alleged onset date. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that the ALJ's failure to consider medical evidence prior to claimant's alleged onset of disability was reversible error); *see also Hamlin v. Barnhart,* 365 F.3d 1208, 1223 n. 15 (10th Cir.2004) (medical reports dating from an earlier adjudicated period are nonetheless part of the case record and should have been considered by the ALJ). The Commissioner's own requirement that ALJs consider *all* the evidence in the record, in combination with Tenth Circuit precedent, is compelling. The defendant argues that such evidence is of little relevance. While that may be the case, the Court

---

[1] The Magistrate's Report and Recommendation states that Dr. Connor treated Kish only through December 2001, but the Court's review reveals that the record would support a finding that Dr. Connor continued to treat Kish through 2007. (See Ex. 13F and Ex. 38F).

notes it still is of relevance.

Although the medical records in this case cover a period of time prior to Claimant's alleged onset date, at least part of those prior records involve many of the same impairments Claimant asserts now as a basis for disability, and therefore, appear relevant to the issue of his current status and disability. These records certainly could be considered as supportive Claimant's allegations of severe mental health issues, particularly recurrent major depression and anxiety.

### 2. Dr. William Irvin, Jr.

Claimant further alleges that the ALJ failed sufficiently to analyze the records and opinions of Dr. Irvin, who treated Claimant for mental health conditions from May 2006 through February 2007. An ALJ must take into account the opinions of medical sources when determining a claimant's RFC. SSR 96-8p. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* As discussed above, an ALJ only has to minimally articulate his reasons for not accepting certain evidence, but even that minimal level should indicate that the records were, at least, considered, and then rejected. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir.2004).

The ALJ opinion fails to acknowledge and discuss any treatments from or opinions of Dr. Irvin. There are significant differences between the opinions of Dr. Irvin, who treated plaintiff, and Dr. Stillings, who only completed a record review. For example, Dr. Irvin noted severe limitation with maintaining concentration, working within a schedule and completing a normal workday without interruption from symptoms. (See Tr. 405). Because the ALJ does not reference, at all Dr. Irvin's treatment and opinions, the Court **FINDS** that the ALJ's findings are

incomplete.

### 3. Mark Tobin, LPC, CCMHC

Claimant further contends that the ALJ did not sufficiently consider the evidence from his treating counselor, Mr. Tobin. The agency's regulations limit treating sources to "acceptable medical sources," the definition of which does not include mental health counselors such as Tobin. 20 C.F.R. § 404.1502; 20 C.F.R. § 404.1513(a). However, Tobin would qualify as an "other source," which is entitled to consideration due to expertise and relationship with Claimant. 20 C.F.R. § 404.1513(d)(1).

The ALJ's decision noted: "Mr. Tobin. . .stated that the claimant had major depression, with severe limitations concentrating, performing within a schedule, maintaining regular attendance, and completing a normal workday and workweek without interruptions from medical based symptoms." (Tr. 17). Further, "Mr. Tobin did not provide specific clinical findings that support his conclusions and his conclusions are not supported by the medical evidence as a whole." *Id.* Contrary to the ALJ's holding, Tobin's assessment of Claimant was supported by a long history of medical evidence and clinical findings, particularly those of Drs. Conner and Irvin. (Exhibits 13F, 26F, and 38F).

Following a thorough review of the record, the Court finds that Tobin's conclusions are supported by much of the medical evidence, including the evidence from treating providers Drs. Conner and Irvin and it is unclear from the record before the Court whether the ALJ considered the reports of Tobin. The ALJ did not mention, much less explain, how the aforementioned material inconsistencies or ambiguities in the evidence in the case record were considered and

resolved. *See* SSR 96-8p. Therefore, the Court cannot find that the record supports the ALJ's opinion that "Mr. Tobin did not provide any specific clinical findings that support his conclusions and his conclusions are not supported by the medical evidence as a whole." (Tr. 17).

"The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). The Court is mindful of the burden placed upon ALJs in Social Security Act cases. A written evaluation of every piece of testimony and evidence submitted is clearly not required. However, a minimal articulation of the ALJ's assessment of the evidence is required, particularly, as in this case, where evidence from treating physicians is presented to counter the agency's position.

## CONCLUSION

Based on the foregoing, the Court **FINDS** that the ALJ's decision that plaintiff Steven D. Kish is not disabled is not supported by substantial evidence in the record as a whole. The Court **REJECTS** the Report and Recommendation (Doc. 32), and **REMANDS** this matter to the Social Security Administration for further proceedings.

 **IT IS SO ORDERED.**

 **DATE   23 March, 2012**

        **/s/  WILLIAM D. STIEHL**
          **DISTRICT JUDGE**